IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2006

## STATE OF TENNESSEE v. BILLY JACKSON COFFELT

**Direct Appeal from the Criminal Court for Davidson County**
**No. D-1179     Cheryl Blackburn, Judge**

---

**No. M2005-01723-CCA-DAC-CD[1] - Filed August 8, 2006**

---

The petitioner, Billy Jackson Coffelt, was convicted in 1983 of assault with intent to commit first degree murder and assault with intent to commit robbery with a deadly weapon. The trial court imposed a sentence of life for the conviction of assault with intent to commit first degree murder and a sentence of not less than ten and not more than twenty-one years for the conviction of assault with intent to commit robbery. There was no direct appeal. After seventeen years of protracted litigation, the post-conviction court granted the petitioner a delayed appeal of his convictions. At the same time, the post-conviction court denied the remaining claims in the petition for post-conviction relief. The petitioner filed separate notices of appeal in each case. The cases were later consolidated by this court upon motion of the petitioner. The single issue presented in the petitioner's delayed appeal is whether the evidence is sufficient to support the convictions. In his appeal of the denial of his post-conviction petition, the petitioner asserts that he was denied the effective assistance of counsel at trial. Because the evidence was sufficient to support the convictions, the judgments of conviction as to the delayed appeal are affirmed; however, because the petitioner was denied the effective assistance of counsel at trial, the judgment of the post-conviction court denying relief must be reversed, the convictions vacated, and the cause remanded for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed in Part; Reversed in Part; Remanded**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Billy Jackson Coffelt.

Paul G. Summers, Attorney General & Reporter; Leslie Price and Sophia Lee, Assistant Attorneys General; Victor S. Johnson, III, District Attorney General; and Brett Gunn and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1]The petitioner's appeal of the denial of his petition for post-conviction relief under case number M2005-00097-CCA-R3-PC was consolidated with the delayed appeal of his convictions in case number M2005-01723-CCA-DAC-CD.

## OPINION

The petitioner and a co-defendant, Terry Campbell, were jointly tried for the shooting and attempted robbery of the victim on July 11, 1980. The petitioner was subsequently convicted of assault with intent to commit first degree murder and assault with intent to commit robbery. He did not perfect a direct appeal of the convictions. In 1987, the petitioner filed a petition for post-conviction relief. The petition was dismissed without a hearing six months later. See State v. Billy J. Coffelt, No. M2001-03073-CCA-MR3-PC (Tenn. Crim. App., at Nashville, July 2, 2003) (Coffelt II); State v. Billy J. Coffelt, No. M1998-00337-CCA-R3-CD (Tenn. Crim. App., at Nashville, Feb. 1, 2001) (Coffelt I). Eleven years later, the petitioner, apparently unaware of the dismissal, filed a motion asking about the status of his petition and seeking to set an evidentiary hearing on his claims. The post-conviction court denied the motion on the basis of the earlier dismissal. The petitioner then filed an unsuccessful motion for delayed direct appeal. On appeal, this court remanded the case to the post-conviction court for an evidentiary hearing to determine "whether the [petitioner] received due notice of the denial of his post-conviction petition." Coffelt I, slip op. at 2. Upon remand, the post-conviction court concluded that the petitioner "'was not aware, through his own knowledge or knowledge that could be attributed to him, of the final judgment denying his Post-Conviction Petition,'" see Coffelt II, slip op. at 2, but nevertheless denied the petition without a hearing. On appeal after remand, this court concluded that "it was error for the post-conviction court to summarily dismiss the petition without holding an evidentiary hearing" and remanded for a hearing on the claims raised in the post-conviction petition. Coffelt II, slip op. at 3.

Upon remand, the post-conviction court appointed counsel. An amended petition was filed and an evidentiary hearing was held on August 2, 2004, some twenty-four years after the crimes. Ultimately, the post-conviction court ruled that the petitioner was entitled to a delayed appeal pursuant to Tennessee Code Annotated section 40-30-118 (1983) "[i]n the interest of justice." In the same order, however, the post-conviction court denied the remainder of the petitioner's claims for post-conviction relief. The petitioner subsequently filed a notice of appeal to this court based upon the grant of the delayed direct appeal of his convictions. He also filed a separate notice of appeal based upon the post-conviction court's denial of his remaining post-conviction claims.

In Gibson v. State, 7 S.W.3d 47, 50 (Tenn. Crim. App. 1998), this court established procedural guidelines for a delayed appeal. This court ruled that when such an appeal was warranted, as in this instance, the remaining post-conviction allegations should be dismissed without prejudice while the direct appeal is in process. Under the procedural guidelines set forth in that case, the dismissal was to be without prejudice so that, at the conclusion of the direct appeal, a subsequent petition for post-conviction relief could be filed without any concern over procedural bars such as waiver or previous determination. See Tenn. Code Ann. § 40-30-106(g), (h) (2003); cf. Tenn. Code Ann. § 40-30-102(c) ("[I]f a prior petition has been filed which was resolved on the merits by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed."). Later, in 2002, our supreme court amended Rule 28 of the Rules of the Supreme Court relating to the grant of a delayed appeal. That rule now provides as follows:

Upon determination by the trial court that the petitioner was deprived of the right to file an appeal pursuant to Rule 3, Tennessee Rules of Appellate Procedure, the trial court shall apply the procedures set out in Tennessee Code Annotated section 40-30-[1]13.

Tenn. Sup. Ct. R. 28 § 9(d)(1)(a). In State v. Ben Thomas Dowlen, No. M2003-00508-CCA-R3-CD (Tenn. Crim. App., at Nashville, July 20, 2004), perm. app. denied (Tenn. Nov. 15, 2004), this court addressed the change in procedure mandated by the amendment, observing that "[a]lthough the supreme court provided for a stay of the post-conviction collateral-attack proceedings pending a Tennessee Rule of Appellate Procedure 11 delayed appeal and pending a Rule 3 delayed appeal granted by the appellate court, Rule 28 makes no stay provision when the post-conviction court grants a Rule 3 appeal." Id., slip op. at 2. Describing the absence of such a provision as "conspicuous," this court concluded that the amendment authorized the trial court to simultaneously grant a delayed appeal and deny post-conviction relief. Id. Because our supreme court has, by rule, approved the procedure utilized in this case, this court is in the unusual position of considering a delayed direct appeal at the same time as an appeal of the denial of post-conviction relief.

## I. Delayed Appeal

The only issue presented in this delayed appeal is whether the evidence was sufficient to support the convictions. The petitioner contends that the evidence was insufficient because it consisted primarily of the questionable testimony of an accomplice, Cathy Campbell. The state submits that the evidence was sufficient.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 286 S.W.2d 856, 859 (1956). Because a verdict of guilty against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

As to the conviction for assault with intent to commit first degree murder, the statute in effect at the time of the crime provided, in pertinent part, as follows:

Whoever shall feloniously and with malice aforethought assault any person, with intent to commit murder in the first degree, or shall administer or attempt to give any

poison for that purpose, though death shall not ensue, shall, on conviction, be imprisoned in the state penitentiary for not less than five (5) nor more than twenty-five (25) years.

Tenn. Code Ann. § 39-604(a) (1980) (repealed 1982). Assault with intent to commit robbery was defined as follows:

Whoever shall assault another, with intent feloniously and willfully to commit a robbery, shall, on conviction, be imprisoned in the penitentiary not less than three (3) years nor more than fifteen (15) years. If the assault is committed by means of a deadly weapon, whether injury results to the person assaulted or not, the penalty on conviction shall be imprisonment in the penitentiary for not less then (sic) five (5) years nor more than twenty-one (21) years.

Tenn. Code Ann. § 39-607(a) (1980) (repealed 1982).

At trial, the victim, Bernard Tefteller, testified that shortly before midnight on July 10, 1980, he was drinking at the V.I.P. Lounge on Murfreesboro Road in Nashville when Cathy Campbell came into the club and initiated a conversation with him about the pinball machine. He recalled that after a short while, Ms. Campbell suggested that they "go someplace else that is a little bit more exciting and has better music." At that point, the two left in the victim's car and drove to a parking lot where the driver of a dark green vehicle pointed a gun at the victim and said, "Hold it! Vice Squad!" The victim testified that he was shot in the arm as he "jerked the car in gear," suffering a broken bone and a torn muscle. He described the weapon used as a .45 automatic. The victim stated that he was able to see both the driver and the passenger of the other vehicle clearly during the offense. According to the victim, he tried to drive away after the shooting but Ms. Campbell "kept jerking the gearshift" and said, "You are not going anywhere; we have got you."

The victim testified that despite Ms Campbell's interference, he was able to drive to a Ryder Truck Rental, where employees called for the police and an ambulance. The victim identified the petitioner as the shooter and the co-defendant, Terry Campbell, as the passenger in the dark green vehicle on the night of the offenses. According to the victim, approximately two weeks after police returned his vehicle to him, he and a coworker "got in the car and started tearing the car apart and found what was left of the bullet." The victim testified that he delivered the spent bullet to police.

Cathy Campbell, who was married to the co-defendant at the time of the offense and at trial, testified that she met the petitioner during the spring of 1980. According to Ms. Campbell, she was "riding around out in south Nashville" on the night of the offenses with the co-defendant and the petitioner, who suggested that she go into the V.I.P. Lounge alone "and bring a man out, any man, and take him with me somewhere and get him to park the car" so that the petitioner could "rob him." Ms. Campbell stated that she agreed to take their victim to a designated place "off the main road." She testified that the plan included the use of a .45 caliber handgun that she had stolen from her father to complete the robbery.

-4-

Ms. Campbell testified that she went into the V.I.P. Lounge, initiated a conversation with the victim, and, after a short time, asked him "if he would like to leave . . . and go smoke some marijuana." According to Ms. Campbell, she directed the victim to the designated location and, less than five minutes later, the petitioner "pulled up in the car and pointed the .45 out the window and said, 'Vice squad.'" She recalled that as the victim attempted to drive away, she heard a gunshot. At trial, she claimed that she did not see the co-defendant in the car at the time of the shooting. She also admitted that she had initially told police that a man named Herston Kelley[2] had committed the offenses because she "didn't want [the petitioner] to get in any trouble."

During cross-examination, Ms. Campbell admitted that she had consumed Valium and alcohol on the night of the offenses. She acknowledged that the charges against her for her role in the offenses had been retired as the result of her agreement to become a witness for the state.

Officer Jerry Moore of the Metro Police Department, who participated in the investigation, testified that approximately six weeks after the offenses, the victim provided him with what he believed to be "a spent .45 caliber slug." Officer Moore stated that when he showed five photographs to the victim, the victim selected two of the photographs as being similar to the shooter. One of the two men was the petitioner.

Officer Preston Perkinson, who was also involved in the investigation, testified that the firearms ammunition records at LaBurt's Market in Nashville indicated that Ms. Campbell had purchased .45 caliber ammunition but the date of the purchase was unclear. Officer Perkinson stated that when he prepared a second photograhic lineup, the victim positively identified the petitioner as the shooter. Officer Perkinson claimed that he was unaware that Officer Moore had previously shown the victim a photographic lineup.

Phillip Denning, a defense witness, testified that he and his wife held their annual cook-out on July 11, 1980, and that the petitioner attended the party. He stated that the party lasted "anywhere from 12:00 [noon] . . . that day until it just die[d] off at 2:00 or 3:00 in the morning." According to Denning, guests were asked to make donations to cover the cost of the food and the band and that the petitioner was in charge of collections. Denning claimed that both the petitioner and the co-defendant stayed at the party throughout the evening until the early morning hours. He testified that the scene of the shooting was a thirty-five to forty-five minute drive from his residence. During cross-examination, Denning admitted that although he had no independent recollection of the date of the cookout, he had a calender from 1980 that indicated that the party occurred on July 11.

Robert Hutchison, also a defense witness, testified that he attended the Dennings' cook-out and that the petitioner and co-defendant were present throughout the entire evening. Hutchison conceded that he had no independent recollection of the date of the party but recalled that the annual event usually occurred in July. James Paul Estes also testified that the petitioner attended the

---

[2]In the transcript of the evidentiary hearing, this individual's name is spelled "Hurston Kelly."

Dennings' party and stayed throughout the late evening hours and into the early morning hours on the following day. Estes was unable to provide a date for the event.

From this testimony, the jury returned verdicts against the petitioner for assault with intent to commit first degree murder and assault with intent to commit robbery. The victim, who identified the petitioner as the shooter, testified that he was shot in the arm and that his injuries required several surgeries over the course of more than a year. Cathy Campbell testified that she planned the robbery along with the petitioner and the co-defendant and was with the victim when he was shot. Although the petitioner claims that Ms. Campbell's testimony was not credible, questions of credibility are resolved by the jury and not by this court. Liakas, 286 S.W.2d at 859. As to the alibi defense, the state presented witnesses who testified that the shooting occurred during the early morning hours of July 11, 1980, while the Dennings' annual cookout did not begin until noon that day. Under these circumstances, it is our view that he evidence was sufficient to support the convictions.

II. Post-Conviction Petition

In his petition for post-conviction relief, the petitioner asserted that he was denied the effective assistance of counsel at trial. Specifically, he claimed that his trial counsel was ineffective by failing to preserve his right to a speedy trial, by failing to adequately investigate the facts of the case, by failing to file a motion to suppress the pretrial identification by the victim, by failing to object to the introduction into evidence of a bullet found in the victim's car, by failing to object to the introduction of a receipt for the purchase of ammunition, by failing to request a continuance, and by failing to file a Notice of Alibi. Finally, he contended that his trial counsel had an actual conflict of interest by also undertaking representation of the co-defendant.[3]

At the evidentiary hearing, which was held some seventeen years after the petitioner filed his original petition for post-conviction relief, the petitioner's sister, Wilma Jo Poole, testified that at the time of the offenses, the petitioner and Ms. Campbell were involved in a romantic relationship. Ms. Poole claimed that the two had lived with her and had slept with each other in the same bed for approximately six months. She recalled that Ms. Campbell was married to the co-defendant during that time and that the petitioner and Ms. Campbell had "parted ways" by the time of the trial.

The petitioner testified that he agreed to pay trial counsel $15,000 to represent both him and the co-defendant, who was dating and living with the petitioner's sister at the time. According to the petitioner, the co-defendant had agreed to reimburse him for half of the fee but never did so. The petitioner recalled that payment was secured by a lien on his father's house, which the petitioner stood to inherit upon his father's death. He stated that trial counsel drew up a contract for payment on the criminal case which provided for payment of $15,000 plus ten percent in interest for each year that the bill remained unpaid. At the same time, trial counsel drew a will for the petitioner's father, which provided that the petitioner would inherit the residence. The petitioner testified that trial

---

[3] While the petitioner also claimed that his trial counsel was ineffective by failing to perfect a direct appeal, this claim was resolved by the post-conviction court's grant of a delayed appeal.

counsel had the property sold at auction in 1990, some ten years after the offense, receiving $24,000 from the transaction.

The petitioner testified that after the jury verdicts, his trial counsel failed to file a motion for new trial and that he "went on to prison and . . . never saw [trial counsel] anymore after that." The petitioner claimed that after he was charged, he saw his trial counsel only once and did not see him at all between the time of his arraignment and the time of trial. He contended that trial counsel failed to preserve his right to a speedy trial by refusing to file a motion demanding trial or asking for dismissal. According to the petitioner, although the offense occurred in July of 1980, he was not indicted until September of 1982 and his trial was not until October of 1983. The petitioner explained that after his initial arrest in 1980, the case was dismissed by the General Sessions Court when the victim failed to prosecute the case. He claimed that he was surprised when he was informed of the indictment two years later.

The petitioner also contended that his trial counsel failed to adequately investigate the case. According to the petitioner, he informed his trial counsel that he could provide witnesses to verify his whereabouts on the day of the offense but that trial counsel failed to interview those witnesses prior to the trial and failed to secure their presence at trial. The petitioner recalled that when he realized that his alibi witnesses were not present, he sent his sister to bring them to court. The petitioner asserted that even after the witnesses arrived, trial counsel failed to argue an alibi defense. He also claimed that if trial counsel had adequately investigated the case, he would have realized that the "true" offense date was July 10 rather than July 11. According to the petitioner, he went to work on the 10th, helped a friend install a stereo in his car until approximately 9 p.m., and then returned to his father's house, where he lived at the time. He testified that his father and the friend he had helped, both of whom had died since the trial, could have verified this information.

The petitioner testified that trial counsel failed to adequately prepare, claiming "[h]e just basically got discovery three days before trial and went to trial . . . without him doing any investigation or question[ing] any witnesses whatsoever." The petitioner claimed that he specifically asked trial counsel to determine prior to trial whether the gun allegedly used during the robbery had been stolen, as Cathy Campbell contended. He recalled that counsel failed to act on his suggestion and "never really" cross-examined Ms. Campbell about the gun at trial.

The petitioner also claimed that trial counsel should have filed a motion to suppress the pretrial identification by the victim. According to the petitioner, the victim initially failed to make a positive identification and identified him only when shown a second photographic array which contained the same picture as in the initial lineup. The petitioner also contended that trial counsel should have objected to a bullet the victim claimed to have found in his car after the offenses based upon the lack of a proper chain of custody.

The petitioner insisted that his trial counsel failed to adequately cross-examine Cathy Campbell at trial, arguing that she should have been impeached with the initial statement she gave to the police, wherein she claimed that she committed the crime with Hurston Kelly. The petitioner

claimed that he had met Kelly while in prison and that Kelly had informed him that Ms. Campbell had attempted to blame him for the crime because she was upset that he had ended their romantic relationship. The petitioner contended that trial counsel should have asked Ms. Campbell about his romantic relationship with her for impeachment purposes:

> [H]e never brought any of that up. . . . [O]nce Cathy testified that she didn't see [the co-defendant] in the passenger's seat of the car that night, [trial counsel] sort of tore back. He didn't really tear into her. He didn't really get into her at all after that, you know, I don't know if he was trying to protect [the co-defendant], but he let her go [without adequate cross-examination] . . . .

The petitioner also testified that his trial counsel failed to impeach Ms. Campbell with a prior statement wherein she had claimed that a "friend" had dropped her off at the V.I.P. Lounge, which was different than her testimony at trial:

> [O]nce Cathy . . . didn't put Terry in the passenger's seat of that car, I believe at that point, [trial counsel] just pulled back on it. He asked her about some drug problems and stuff like that, but he didn't really . . . impeach her the way you are supposed to when you know a witness is lying . . . . I don't know if he was trying to protect [the co-defendant], but he just let me go . . . . That is the way I feel about it.

During cross-examination by the state, the petitioner conceded that trial counsel had represented him on several matters, including jury trials in Sevier and Davidson Counties, during the time that this case was pending. He testified that he was aware of the facts of this case because Ms. Campbell telephoned him on July 11, 1980, while he was preparing to attend the Dennings' barbecue and told him that "she had gotten into some trouble." He claimed that Ms. Campbell "pleaded with" him to take her to the party and that, on the way, she informed him that she had been arrested on the previous evening but had not been charged. According to the petitioner, Ms. Campbell told him that she did not know the identity of either the victim or the shooter and had claimed that "she was up there smoking a joint with somebody and the guy had pulled up beside her." The petitioner conceded that he knew that "the incident that Ms. Campbell was involved in . . . had occurred before" the evening of the Dennings' party. He also acknowledged that the only date contained in the indictment was July of 1980.

Trial counsel, a witness for the state, testified that at the time of the petitioner's trial, "there was no general practice of filing a motion for discovery" and contended that the generally accepted practice was to "sit down with the District Attorney and whatever information you could glean from the file, the General would normally give to you." As to the filing of other pretrial motions, trial counsel stated that he did not recall "that it was done then." He maintained that he could not remember anything specific with regard to the trial because of the passage of time until the evidentiary hearing. He could not even recall whether he had represented both the petitioner and the co-defendant, explaining that he did not "dispute the record" and observing that "the usual practice back then" permitted dual-representation. Trial counsel also contended that at the time of the

-8-

petitioner's trial, attorneys were not required to file a motion to withdraw prior to resigning from the case after the filing of a motion for new trial.

At the conclusion of the hearing, the post-conviction court granted the petitioner a delayed appeal but denied relief with regard to his claims of ineffective assistance of counsel. The court concluded that trial counsel had adequately investigated the case and that, even if he had not done so, the petitioner had failed to prove that he had been prejudiced by any alleged deficiency in the investigation. The post-conviction court determined that trial counsel was not deficient by failing to file a Notice of Alibi and observed that the petitioner was "confused" about the offense date. The court ruled that the petitioner was not prejudiced by trial counsel's failure to challenge the pretrial identification by the victim or by trial counsel's failure to challenge the chain of custody of a bullet found in the victim's car. Finally, the post-conviction court, observing that it was bound by this court's opinion in the co-defendant's appeal, concluded that the petitioner was not prejudiced by trial counsel's dual representation.

In this appeal, the petitioner contends that he was denied the effective assistance of counsel at trial. He specifically asserts that his trial counsel was ineffective by failing to adequately investigate, by failing to request discovery, by failing to file a Notice of Alibi and subpoena alibi witnesses, by failing to preserve his right to a speedy trial, by failing to file a motion to suppress the pretrial identification by the victim, by failing to object to the admission into evidence of a bullet found in the victim's car and a receipt for the purchase of ammunition, and by having an actual conflict of interest. The state submits that trial counsel performed adequate pretrial investigation and that the record establishes that trial counsel received discovery from the state prior to trial. The state also submits that the petitioner was not denied a speedy trial, that the pretrial identification was not unduly suggestive, that the bullet was properly admitted into evidence, and that the ammunition receipt was not admitted into evidence. Finally, while the state concedes that there was a conflict of interest, it contends that the petitioner failed to establish that he was prejudiced by trial counsel's joint representation.

Under our current statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). Under the version of the Post-Conviction Procedure Act in effect at the time of the filing of the petition in this case, however, the petitioner was only required to establish his claims by a preponderance of the evidence. See Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny, 576 S.W.2d at 14.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the

defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. Id. at 687. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

A.

The petitioner first asserts that his counsel was ineffective by failing to adequately investigate the facts of the case. He contends that if counsel had investigated properly prior to trial, he would have been aware that the offense was alleged to have occurred during the late evening hours of July 10 and early morning hours of July 11 rather than the late evening hours of July 11. The petitioner claims that he summoned witnesses to verify his whereabouts late on July 11 as a result of the inaccurate information. According to the petitioner, his father and a friend could have verified that he was at home on the evening of July 10. The petitioner testified that during the seventeen-year delay between the filing of his original post-conviction petition and the evidentiary hearing, both potential witnesses had died. The petitioner also asserts that trial counsel failed to investigate Cathy Campbell's claim that she had stolen from her father the weapon used during the robbery. In addition, the petitioner contends that trial counsel failed to locate, interview, or subpoena any potential witnesses and failed to request discovery. Trial counsel testified that he had no specific recollections about the facts of the petitioner's case but did note that the filing of discovery requests was not generally done at the time of the petitioner's trial.

The post-conviction court concluded that "trial counsel did in fact conduct investigation and even called witnesses on [the] [p]etitioner's behalf as demonstrated by the trial transcript." The court also determined that although trial counsel may not have met with the petitioner specifically regarding this case, "the evidence at the evidentiary hearing showed that [trial counsel] had a longstanding relationship with [the] [p]etitioner, representing him on several trials. . . . Given the representation on multiple cases in close proximity, discussions regarding [those cases] may have involved discussions regarding the other pending cases." Finally, the post-conviction court ruled that the petitioner had failed to establish that he was prejudiced by any alleged deficiency in trial counsel's investigation.

Initially, it is our view that the record does not support the post-conviction court's finding that trial counsel conducted an investigation prior to the petitioner's trial in this case. Trial counsel specifically testified that he could not recall any details about the petitioner's case and did not even claim that he had conducted an investigation. There is simply no evidence that that he interviewed any witnesses. Furthermore, the trial transcript establishes that the three defense witnesses were summoned to court by the petitioner's sister, Wilma Jo Poole. There is no indication that trial counsel interviewed them prior to their testimony. It was unrefuted that the petitioner had asked trial counsel to subpoena the witnesses. Ms. Poole had to leave the trial in order to secure their presence. Preparation by trial counsel might have led to the discovery that the witnesses would be testifying to alibi for a day after the crime.

Nevertheless, the petitioner has failed to establish that he was prejudiced by any deficiency in trial counsel's pretrial investigation. At the evidentiary hearing, he expressed an awareness that the crimes occurred on the evening and early morning hours immediately prior to the Dennings' cookout. He stated that Ms. Campbell had, in fact, told him so. The victim reported that the offense occurred during the late evening hours of July 10 and early morning hours of July 11. The testimony provided at trial by the victim and Ms. Campbell confirmed that report. The indictment did not specify a date. It is unclear from the record why the petitioner believed that the offense occurred during the late evening hours of July 11. His testimony at the evidentiary hearing suggests that he was simply confused about the timing of the offense. Because there was no discrepancy in the date or time of the offense, trial counsel could not have been deficient for failing to have discovered that which did not exist.

Further, the petitioner failed to establish that there was information regarding the theft of the weapon that would have been relevant and admissible at his trial. Finally, the petitioner conceded that the witnesses he wanted to testify on his behalf were, in fact, witnesses at the trial.

B.

The petitioner next contends that his trial counsel was ineffective by failing to file a Notice of Alibi, thereby depriving him of the right to present a defense. He also asserts that trial counsel should have requested a continuance when it became apparent that there was a discrepancy in the time frame of the offenses. The record establishes that the victim testified that he arrived at the V.I.P. Lounge at 10:00 p.m. on July 10, 1980, and left with Cathy Campbell at 11:45 p.m. The

shooting occurred just after midnight. Thus, the offense date was July 11, 1980. Three witnesses testified on the petitioner's behalf that he attended a cookout during the evening hours of July 11, 1980. At the conclusion of the trial, trial counsel did not request an instruction on alibi as a defense and conceded that no Notice of Alibi had been provided prior to trial. The trial court did not provide an instruction on alibi. The defense witnesses, of course, did not testify to an alibi during the time frame of the offense. Thus, the filing of a notice would have made little difference.

The post-conviction court concluded that the petitioner was "confused about the date the offense is alleged to have occurred" and ruled that there was no basis for trial counsel to request a continuance because there was no discrepancy in the offense date. The court also observed that the petitioner was permitted to present alibi evidence at trial and that the jury could have considered this evidence despite the lack of an alibi instruction.

Again, the petitioner has been unable to establish that he was prejudiced by any deficiency in this regard. As indicated, the petitioner testified that on July 11, as he was preparing to attend the Dennings' barbecue, he spoke with Ms. Campbell, who informed him that she had been involved in the offense on the previous evening. Thus, the petitioner acknowledged his awareness prior to the trial that the offense did not occur at the same time as the cookout but on the previous evening. The petitioner conceded that there would have been no reason for trial counsel to present witnesses to verify his whereabouts at the time of the barbecue. He admitted that the three defense witnesses testified at his request and were not subpoenaed by trial counsel. Unfortunately for the petitioner, his father and another individual who he claims could have established an alibi had died prior to the evidentiary hearing. While their testimony might have been helpful, this court cannot speculate upon the nature of what they might have said. Furthermore, the petitioner acknowledged that he did not make trial counsel aware of either his father's potential testimony or that of the other individual prior to the trial. That he did not do so under the circumstances then existing casts doubt on the petitioner's claim. The burden, of course, is on the petitioner to establish prejudice. It is our view that he has failed to do so.

C.

The petitioner also contends that his trial counsel was ineffective by failing to preserve his right to a speedy trial. The record establishes that the petitioner was indicted in September of 1982 and tried in October of 1983. The right to a speedy trial is, of course, constitutionally based. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In State v. Bishop, 493 S.W.2d 81 (Tenn. 1973), our supreme court adopted a four-factor analysis first established in Barker v. Wingo, 407 U.S. 514 (1972), for determining whether one has been denied his entitlement to a speedy trial:

(1) the length of the delay;
(2) the reason for the delay;
(3) whether the defendant asserted a claim to his right; and
(4) whether the defendant was prejudiced by the delay.

Bishop, 493 S.W.2d at 84. The length of the delay is a triggering mechanism. Until there is some delay which is presumptively prejudicial, characterized in some federal and state cases as being from one to two years, there is no necessity for inquiry into the other factors. Barker, 407 U.S. at 530. The record establishes that there was a thirteen-month delay between the indictment and trial. That period of time was not sufficient to trigger consideration of the remaining factors. Moreover, none of the other factors favor the petitioner. In consequence, he has failed to establish that he was prejudiced by trial counsel's failure to file a motion for speedy trial.

D.

The petitioner next contends that his trial counsel was ineffective by failing to file a motion to suppress the pretrial identification by the victim, which he claims was unduly suggestive. The petitioner testified that shortly after the offenses, the victim was shown a photographic lineup that included his photograph but was unable to make a positive identification. He stated that several weeks later, the victim was shown another photographic lineup that contained the same photograph of him and made a positive identification. The post-conviction court concluded that the petitioner had "not demonstrated that he was prejudiced by trial counsel's alleged deficiency regarding the photograph identification."

In Neil v. Biggers, the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. 409 U.S. 188, 198-99 (1972). First, trial courts must determine whether the procedure used to obtain the identification was unduly suggestive. Id. at 198. A violation of due process has occurred if the identification procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Id. If a court finds that the identification procedure was unduly suggestive, the court must determine whether, under the totality of the circumstances, the identification is nevertheless reliable. Id. at 199; State v. Brown, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). This standard was adopted by our supreme court in Bennett v. State, 530 S.W.2d 511, 512-15 (Tenn. 1975). A finding that the pretrial identification was unreliable will also require the exclusion of a subsequent in-court identification by the same witness. State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). Factors to be considered are as follows:

(1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the witness' degree of attention at the time of the crime;
(3) the accuracy of the witness' prior description of the criminal;
(4) the level of certainty demonstrated at the confrontation; and
(5) the time elapsed between the crime and the confrontation.

Neil, 409 U.S. at 199; see also Philpott, 882 S.W.2d at 400.

Here, the trial transcript establishes that the victim was, in fact, shown two photographic lineups several weeks apart, each of which contained a photograph of the petitioner. The officer who conducted the first lineup testified that the victim chose two photographs as being similar to the shooter. One of the two was a photograph of the petitioner. Several weeks later, another officer,

-13-

who testified that he was unaware of the first lineup, showed the victim a second photographic array. This time the victim positively identified the petitioner as the shooter. Both officers were thoroughly cross-examined on the identification procedure. The second officer stated that he did not know whether the same photograph of the petitioner had been used in both lineups. He explained that the first array had not been preserved. The victim, who testified that he was only a few feet away and able to clearly see the face of the gunman, positively identified the petitioner at trial. He expressed a high degree of certainty. In our view, the Neil factors favor the admission of the identification. Thus, no prejudice resulted from trial counsel's failure to challenge identification prior to trial. In consequence, the petitioner is not entitled to relief.

### E.

The petitioner also asserts that his trial counsel was ineffective by failing to object to the admission into evidence of a bullet the victim claimed to have found in his car and of a receipt for .45 caliber ammunition signed by Ms. Campbell. He specifically contends that trial counsel should have objected to the bullet because the state had failed to establish a proper chain of custody. With regard to the receipt, he contends that the receipt was inadmissible hearsay. The post-conviction court determined that the admission of the bullet into evidence was "not a chain of custody issue in that the police did not recover the bullet and were unable to account for its chain of custody within the department." The court concluded that the petitioner was not prejudiced by trial counsel's failure to object because "the issue that the bullet was recovered later was before the jury." As to the receipt, the post-conviction court ruled that the petitioner had failed to establish prejudice because the receipt was not actually admitted into evidence at trial.

The victim testified that after his vehicle was returned to him by the police, he and a co-worker dismantled the dash and discovered a spent .45 slug. He then took the slug to the police department, which maintained custody until trial. The victim was thoroughly cross-examined about his discovery of the bullet, conceding that police had previously searched his car for evidence prior to returning it to him. Under these circumstances, the evidence was properly admitted. It is our view, therefore, that the petitioner was not prejudiced by trial counsel's failure to object.

Although Ms. Campbell and Officer Perkins were questioned about an ammunition receipt, it was not admitted into evidence. No prejudice could have resulted. Thus, the petitioner is not entitled to relief on this issue.

### F.

Finally, the petitioner asserts that his trial counsel was ineffective by undertaking joint representation of both him and his co-defendant because there was an actual conflict of interest. He contends that when Ms. Campbell claimed that she did not see the co-defendant in the car at the time of the shooting, trial counsel failed to impeach her with her prior inconsistent statements to police and failed to cross-examine her regarding the status of their romantic relationship. The petitioner claimed that when trial counsel "backed off" of Ms. Campbell after she gave exculpatory testimony about the co-defendant, he sacrificed his advocacy for the petitioner.

The post-conviction court observed that this court had previously determined that trial counsel was ineffective by representing both the petitioner and the co-defendant and that the co-defendant was prejudiced by the dual representation. See Terry Campbell v. State, No. 86-280-III (Tenn. Crim. App., at Nashville, Apr. 7, 1987). This court ordered a new trial for the co-defendant. The post-conviction court also observed that in concluding that the co-defendant was entitled to a new trial, this court had indicated that there was "a conflict of interest that adversely affected the attorney's representation of [the co-defendant], but not [the petitioner]." See id. The post-conviction court ruled that "[t]his decision applies to [the petitioner's] case as a matter of law" and determined that the petitioner was not entitled to a new trial because he suffered no prejudice from the dual representation.

Initially, it is our view that the post-conviction court erred by concluding that this court's decision in Campbell was a binding conclusion of law in the case of the petitioner. In Massengill v. Scott, our supreme court summarized the related doctrines of res judicata and collateral estoppel:

"The doctrine of collateral estoppel or estoppel by judgment is an extension of the principle of res judicata, and is generally held to be applicable only when it affirmatively appears that the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment . . . .

Res judicata bars a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit. To support a plea of res judicata, it must be shown that the judgment in the prior case was final and concluded the rights of the party against whom it is asserted. It is also necessary to show that both cases involved the same cause of action. To sustain a plea of collateral estoppel it must be shown, inter alia, that the issue sought to be concluded not only was litigated in the prior suit but was necessary to the judgment in that suit."

738 S.W.2d 629, 631-32 (Tenn. 1987) (quoting 22 Tenn. Jur. pp. 111-12). "Privity within the meaning of the doctrine of res judicata is privity as it exists in relation to the subject matter of the litigation." Harris v. St. Mary's Medical Center, Inc., 726 S.W.2d 902, 905 (Tenn. 1987). "One defending on the basis of res judicata or collateral estoppel must demonstrate that 1) the judgment in the prior case was final and concluded the rights of the party against whom the defense is asserted, and 2) both cases involve the same parties, the same cause of action, or identical issues." Richardson v. Board of Dentistry, 913 S.W.2d 446, 459 (Tenn. 1995) (citing Scales v. Scales, 564 S.W.2d 667, 670 (Tenn. Ct. App. 1977)).

The principle of res judicata is not applicable in this case because the prior litigation involved neither the same parties nor the same cause of action. Similarly, the doctrine of collateral estoppel would not apply because the prior litigation did not include the petitioner as a party and because this court's reference to the petitioner was not necessary to the final judgment. Moreover, the state has not established that the petitioner qualifies as a privy of the co-defendant as defined by case law. Because the ruling does not qualify as a prior action involving the same defendant, the ruling in Campbell is not binding precedent in the petitioner's case. See Kenneth B. White v. State, No. W2004-02553-CCA-R3-PC (Tenn. Crim. App. 2006) (quoting Tenn. R. Sup. Ct. 4(H)(1)) ("'An unpublished opinion shall be considered controlling authority between the parties to the case when relevant under the doctrines of the law of the case, res judicata, collateral estoppel, or in a criminal, post-conviction, or habeas corpus action involving the same defendant.'").

A claim of ineffective assistance of counsel based upon an attorney's conflict of interest is examined under a slightly different standard than a traditional ineffectiveness claim. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). In Strickland, the Court summarized it's holding in Cuyler as follows:

> In Cuyler . . . [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

Strickland, 466 U.S. at 692. The Court did not rule, however, that multiple representation is per se prejudicial to defendants:

> Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."

Id. (quoting Cuyler, 446 U.S. at 350). Our supreme court has observed that "an actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" State v. White, 114 S.W.3d 469, 476 (Tenn. 2003) (citing State v. Culbreath, 30 S.W.3d 309, 312-13 (Tenn. 2000); Tenn. R. Sup. Ct. 8, EC 5-1)). Our high court determined that "[i[n the context of multiple employment . . . an actual conflict arises where an attorney's continuance of such employment 'would be likely to involve the lawyer in representing differing interests.'" Id. (citing Tenn. Sup. Ct. R. 8, DR 5-105(B)). This court has said that "[t]he proper focus is solely upon whether counsel's conflict affected counsel's actions." Netters v. State, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997).

The right to counsel requires complete devotion to the interest of the defendant. State v. Knight, 770 S.W.2d 771, 775 (Tenn. Crim. App. 1988). "[A] lawyer forced to represent co[-]defendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." Cuyler, 446 U.S. at 345 (citing Holloway v. Arkansas, 435 U.S. 475, 481-482 (1978)). In White, our supreme court explained the role of defense counsel:

"[T]he basic duty defense counsel owes to the administration of justice and as an officer of the court is to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation." This duty requires defense counsel to exert every reasonable effort to protect the client's interests, both in the investigation and the trial of a case, by interviewing the client; apprising the client of his or her rights; conducting a thorough legal and factual investigation of the case; attempting to obtain information in the possession of the prosecution and law enforcement authorities; filing appropriate motions for the suppression of the evidence; raising all available claims, issues and defenses; conducting effective cross-examination of the State's witnesses; and attempting to mitigate punishment if the client is convicted. In sum, counsel must be constantly guided by the obligation to pursue the defendant's interests and to do so to the fullest extent allowed by the law and applicable standards of professional conduct.

Id. at 477-478 (citations omitted). When counsel is unable to provide a "zealous representation . . . unfettered by conflicting interests," there has been a breach of the right to the effective assistance of counsel. State v. Thompson, 768 S.W.2d 239 (Tenn. 1989). Our Rules of Professional Responsibility provide that "[l]oyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." Tenn. Sup. Ct. Rule 8, Canon 1.7. "Under Cuyler, loyalties divided between co-defendants necessarily will infect the very core of at least one's defense, and prejudice should be presumed." See Caban v. United States, 281 F.3d 778, 782 (8th Cir. 2002).

As indicated, the United States Supreme Court has held that because there is a breach of loyalty in cases involving an actual conflict of interest, prejudice is presumed. Cuyler, 446 U.S. at 350. When a defendant fails to object to the multiple representation at trial, however, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" and the mere possibility of prejudice will not warrant relief. Id. at 348. "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim . . . ." Id. at 349-50 (citations omitted).

Here, the petitioner hired trial counsel to represent him and the co-defendant as a favor to the latter, who was dating the petitioner's sister. The record suggests that at the time of trial, counsel was aware of the petitioner's prior romantic relationship with Ms. Campbell and the fact that the petitioner

had ended the relationship. The petitioner contended that after Ms. Campbell provided testimony that exculpated the co-defendant, trial counsel "sort of tore back. . . He didn't really get into her at all after that . . . I don't know if he was trying to protect [the co-defendant], but he let her go." He recalled that trial counsel failed to impeach Cathy Campbell with the prior inconsistent statements she had provided to the police and did not cross-examine her regarding her romantic relationship with him, explaining that "once . . . she didn't put [the co-defendant] in the passenger's seat of that car . . . [trial counsel] just pulled back . . . . He asked her about some drug problems and stuff like that, but he didn't . . . impeach her the way you are supposed to when you know a witness is lying." The trial transcript substantiates his claims. It establishes that trial counsel did not question Ms. Campbell about her prior relationship with the petitioner or otherwise attempt to exploit their break-up as a possible motive for her to lie. Nor did he question her regarding her statement that she had stolen from her father the weapon used in the shooting. The record further establishes that the only questions asked of Ms. Campbell during cross-examination related to her previous drug use.

This court has observed that "there is a strong likelihood that an attorney who represents multiple co-defendants will encounter a conflict of interest as there will almost always be a disparity in their relative positions." Howard Clifton Kirby v. State, No. 03C01-9303-CR-00074, slip op. at 7 n.3 (Tenn. Crim. App., at Knoxville, Sept. 28, 1994). There was a disparity in the positions of the petitioner and his co-defendant. Ms. Campbell specifically implicated the petitioner in the offenses and provided the only proof of premeditation on the charge of assault with intent to commit first degree murder. Despite her previous statements to the contrary, Ms. Campbell attempted to exonerate the co-defendant, testifying at trial that there was no one in the passenger seat of the petitioner's vehicle. When Ms. Campbell, one of the state's primary witnesses failed to implicate the co-defendant as anticipated, an actual conflict of interest presented itself. Campbell and the petitioner had competing defenses. Trial counsel should have then made an attempt to withdraw from the dual representation. See Tenn. Sup. Ct. Rule 8, Code of Professional Responsibility, EC 5-14 (stating that such representation may constitute a violation of the Code of Professional Responsibility). In order to best serve the petitioner, counsel should have attacked the credibility of Ms. Campbell and pointed out the inconsistencies in her pretrial statements to the police and her testimony at trial. Because she had provided exculpatory testimony for the co-defendant, however, counsel was faced with an unavoidable dilemma. An attack on the credibility of the witness would have been detrimental to the defense of the co-defendant. In Holloway, the Supreme Court ruled that "[i]n a case of joint representation of conflicting interests the evil - it bears repeating - is in what the advocate finds himself compelled to refrain from doing." 435 U.S. at 490.

The situation presented in this case is similar to the one presented in Glasser v. United States, 315 U.S. 60 (1942), where the Supreme Court held that an actual conflict of interest existed. In that case, Glasser and his co-defendant, Kretske, were represented by Stewart. At the trial, a government witness named Abosketes implicated Glasser as the central figure in a bribery scheme but a second witness, Brantman, implicated only Kretske and testified that he "did not know Glasser." Id. at 72. Stewart failed to cross-examine Brantman about Glasser's lack of involvement and indicated that he did so because he was afraid of the implications of such questioning on Kretske's case. Observing that "a thorough cross-examination was indicated to fully develop Brantman's lack of reference to,

or knowledge of, Glasser," the Court concluded that "Stewart's failure to undertake such a cross-examination luminates the cross-purposes under which he was laboring" and granted a new trial.

Here, a thorough cross-examination of Ms. Campbell, including her prior inconsistent statements to police and her romantic relationship with the petitioner, was required to best serve the interests of the petitioner. That counsel failed to pursue such action after Ms. Campbell provided testimony that was exculpatory to the co-defendant demonstrates that counsel was laboring under an actual conflict of interest. Under law, prejudice must be presumed.

The degree to which counsel's failure to cross-examine Ms. Campbell affected the petitioner's case is difficult to ascertain and ultimately irrelevant. Although the victim identified the petitioner as the gunman, Ms. Campbell's testimony provided the only proof that the shooting had occurred during an attempt to rob the victim, a necessary element of the conviction for assault with intent to commit robbery. In addition, her testimony provided the only proof of premeditation, a requirement for a conviction for assault with intent to commit first degree murder. The jury obviously accredited those portions of her testimony. In the case of the co-defendant, this court reversed his conviction and ordered a new trial based upon the actual conflict of interest even though the victim identified him as the passenger at the time of the shooting. Campbell, slip op. at 7. That demonstrates the importance of the right to a conflict-free counsel.

In White, our supreme court observed that "it is notoriously difficult to prove a negative." 114 S.W.3d at 477-478. The Supreme Court has continuously cautioned that "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." Strickland, 466 U.S. at 692; Holloway, 435 U.S. at 490. That is the basis for the rule that once an actual conflict of interest is established, prejudice is presumed. In this instance, the dual representation resulted in an actual conflict of interest that adversely affected the trial counsel's performance to the petitioner's detriment. Because this court must presume that the petitioner was prejudiced by the dual representation, the petitioner is entitled to a new trial.

Accordingly, the judgment of the post-conviction court is reversed, the convictions are vacated, and the cause is remanded for a new trial.

_____
GARY R. WADE, PRESIDING JUDGE